UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | Case No. 23-cr-399 (JMC) |
| v. | : | |
| | : | |
| JOSEPH KERRY HICKS, | : | |
| | : | |
| **Defendant** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. Joseph Kerry Hicks was convicted at trial of two misdemeanors, a violation of 40 U.S.C. § 5104(e)(2)(D) (Disorderly Conduct in a Capitol Building) (Count Four) and a violation of 40 U.S.C. § 5104(e)(2)(G), (Parading, Demonstrating, or Picketing in a Capitol Building) (Count Five). For the reasons set forth herein, the government requests that this Court sentence Hicks to 6 months of incarceration on Count Four and 36 months of probation on Count Five. The government also requests that this Court impose 60 hours of community service.

I.    **Introduction**

Defendant Joseph Kerry Hicks, a 50-year-old man from Missouri, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The

Hicks was convicted at trial of violations of 40 U.S.C. § 5104(e)(2)(D) and (G). Hicks entered the Capitol and helped shut down the ongoing certification of the Electoral College vote count. The government's recommendation is supported by Hicks' attempt to forcefully enter the Capitol building a second time, his intent to stop the peaceful transition of power, his attempt to mislead FBI agents about his conduct, and his complete lack of remorse or acceptance of responsibility for his criminal conduct.

The Court must also consider that the defendant's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, the facts and circumstances of Hicks' crime support a sentence of 6 months of incarceration and 36 months of probation in this case.

## II.   Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* Complaint, ECF 1.

### *Defendant Hicks' Role in the January 6, 2021 Attack on the Capitol*

On January 5, 2021, Hicks traveled from Missouri to Washington, D.C. In the weeks leading up to that trip, Hicks made various internet searches related to the 2020 election and the

---

Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

certification proceeding. Specifically, he visited the Wikipedia pages of "U.S Presidential Line of Succession" and "Vice President of the United States". He visited a website with the title "Impeachment and Removal from Office." June 27, 2024 Tr. 4. He also viewed a video titled "Examining Irregularities in the 2020 Election" and another titled "Full Phone Call, Trump Pressures Georgia Secretary of State to Recount Election Votes". June 27, 2024 Tr. 5. During an interview with the FBI after his arrest, Hicks told law enforcement that he "thought [Congress was] going to overturn the election by looking at it and saying no this election was not legit . . . I thought they were gonna vote to stop it." Ex. 501 at 28:55. These statements coupled with Hicks' internet activity and travel from Missouri to Washington, D.C. together demonstrate that he was aware of the significance of the January 6 certification.

On January 6, Hicks attempted to attend then-President Trump's "Stop the Steal" rally at the Ellipse. Ex. 500 at 9:00. Hicks was told he could not bring his flag inside the security perimeter, so he opted to keep his flag and remain outside of the Ellipse. Ex. 501 at 30:30. As shown in Image 1, Hicks wore a red hat with the words "Trump 2020", sunglasses, a red-and-blue patterned gaiter, a red sweatshirt, a black jacket, and black and yellow mechanic's gloves. He carried a distinctive flag with a large skull and the text "We are everywhere" and "III%". The flag is associated with the Three Percenter Group, an extremist militia movement whose members believe that a small armed force can overthrow a perceived tyrannical government. See ECF 1-1 at 5 n.l; *see also* June 3, 2024 Tr. 91.



*Image 1 – Hicks carrying Three Percenter Flag Near the Washington Monument on January 6, 2021 (Exhibit 400)*

After attending the "Stop the Steal" rally, Hicks joined the mob of rioters at the Capitol building. At 2:41 p.m., Hicks entered the Capitol building. Despite alarms blaring overhead and broken glass at eye level, Hicks entered through the Rotunda Doors on the east side of the building. *See* Image 2. In order to get into the building, Hicks had to step around individuals in the doorway. Ex. 109. He stayed inside the Capitol for approximately 18 minutes, mostly in the Rotunda. He raised his Three Percenter flag in support of the siege and fist bumped with another rioter. Exs. 109, 303.



*Image 2 – Hicks entering the Capitol building at 2:41 p.m. (still of Exhibit 109)*



*Image 3 – Hicks fist bumping another rioter in the Rotunda (still of Exhibit 303)*

While Hicks was in the Rotunda, other members of the mob were draping flags over statues and placing hats on statues. Some were dressed in military-type gear, and one rioter wielded a riot shield. Ex. 109. Hicks admitted that while he was at the Capitol building, from his "viewpoint there [were] people attacking police" and that "people were breaking windows and everything." Ex. 500 at 7:45. Hicks eventually exited through the Rotunda Doors.

After approximately thirty minutes, Hicks came back to the Rotunda Doors at 3:28 p.m. Ex. 108. As he came back to the doors, there was a haze in the air caused by smoke and chemical irritants that had been deployed. As the Court found, "it was not a welcoming scene or one where . . . any reasonable person would have concluded that they should have been there." June 27, 2024 Tr. 12. As Hicks approached, his face was obscured by a mask and a hat, and he held a cylindrical object (the flag, now furled). Hicks turned his head and his face as he moved forward to avoid the smoke and chemical irritants in the air. Nonetheless, as the Court found, Hicks tried to re-enter the Capitol building. *Id.* at 8. On the other side of the door, officers were trying to expel rioters from the building. Hicks tried to "push his way into the building," where he had an interaction with a man in an olive jacket. *Id.* at 12. While the Court could not conclude that Hicks was aware of the officers at this time, it found it "clear that Mr. Hicks [wa]s trying to gain entry into the Capitol." *Id.* at 12.



*Image 4 – Hicks pushing other rioters attempting to reenter the building (still of Exhibit 309)*

While other rioters moved away from the door after this push, Hicks did not. He remained in the doorway for a few seconds. The Court concluded that he was pulled backward for a few seconds by an officer. June 27, 2024 Tr. 9. Hicks eventually backed away from the area and left.



*Image 5 – Hicks against officers in the Rotunda Door at approximately 3:28 p.m. (still of Exhibit 302)*

**Interviews with the FBI**

After January 6, 2021, Hicks was interviewed by the FBI twice. In his first interview, on June 14, 2021, Hicks told the FBI that he was let into the Capitol building by "people at the door" that they "were letting people in." Ex. 500 at 6:45. When asked if he knew he was trespassing Hicks doubled down on his initial statements and told agents, "No, because I was let in. I mean there was even videos that have been coming out that cops were conversing with people that was already in there and saying, 'We'll allow you to come in here but you gotta be peaceful.'" Ex. 500 at 9:44. Video evidence conclusively shows that Hicks was not let into the building by officers. Ex. 109. On August 27, 2023, Hicks was interviewed while in custody. When confronted with his previous statements, Hicks changed his story and told the FBI agent that he was "let in to where

8

they opened the barricades." Ex. 501 at 6:10. He then said that he was pushed into the Capitol building by the force of the crowd and that there were non-officers at the door letting people inside. *Id.* at 6:50, 21:45. The evidence at trial proves that this statement was a lie. In fact, Hicks was not pushed in, and had to maneuver around people to get through the door. Ex. 109. Hicks' suggestion that he did not want to go into the Capitol building but was forced to is also a lie: not only did he stay in the Capitol building for approximately 18 minutes but also that, even after exiting, he tried desperately to go back inside including by using physical force.

During that second interview, that was conducted approximately two and a half years after the events of January 6, Hicks refused to recognize that he and other rioters had done anything wrong. First, he claimed that he was entitled to act as he had. He told agents that he was peaceful and that the U.S. Capitol was the people's house, which gave him every right to go inside. Ex. 501 at 18:00. He framed the rioters as victims who were just exercising their right to freedom of speech and are now being targeted for standing up for their right. *Id.* at 30:00, 47:00, 49:00. Second, to the extent Hicks recognized that there was violence on January 6, Hicks falsely blamed Antifa and Black Lives Matter. He claimed these organizations had infiltrated the riot to try and make Trump supporters look bad. *Id.* at 16:50, 18:15. Hicks also blamed the "deep state", including former Speaker of the House Nancy Pelosi, for orchestrating the attack to make former President Trump look like "the bad guy." *Id.* at 18:45. Hicks has never, to date, shown any remorse for his conduct or recognition of the seriousness of the crimes committed by other rioters.

### The Charges and Trial

On November 15, 2023, the United States charged Hicks by an indictment of violations of 18 U.S.C. § 231(a)(3), 18 U.S.C. § 1752(a)(1), 18 U.S.C. § 1752(a)(2), 40 U.S.C. § 5104(e)(2)(D)

9

and 40 U.S.C. § 5104(e)(2)(G). This Court held a bench trial on June 4 and June 5, 2024. On June 27, 2024, the Court found the defendant guilty of Counts Four and Five.

### III. Statutory Penalties

Hicks now faces a sentencing of up to six months of imprisonment and a fine of up to $5,000 for violating 40 U.S.C. § 5104(e)(2)(D) and (G). As these offenses are Class B Misdemeanors, the Sentencing Guidelines do not apply. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV. Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of 6 months of incarceration and 36 months of probation.

#### A. The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Hicks' participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors.

There are four particularly important aggravating factors in this case. *First*, unlike most other January 6 misdemeanor defendants, Hicks attempted to re-enter the Capitol after having previously joined the riot on the inside of the Capitol for 18 minutes. To get in the first time, Hicks ignored broken glass and alarms at the door. During the time he spent inside the building, there were ample signs he shouldn't have been there—other rioters draping flags over and putting hats

10

on statutes, wearing military gear, and holding a riot shield. Ex. 109. During this second attempt, the scene was more chaotic and, as the Court noted, any rational person would have known—and Hicks did know—they were not meant to be there. His second attempt at entering the Capitol helped prolong the mob's siege of the Capitol. *Second*, Hicks was at the Capitol to stop the certification of the election. He told FBI agents that he was at the Capitol on January 6, 2021 to protest an election he believed to be stolen and that he thought Congress was going to overturn the election and send it back to the states. Ex. 501 at 28:55. Hicks' knowledge of the ongoing certification makes his presence at the Capitol more deserving of a sentence of incarceration. *Third*, Hicks lied to the FBI. Hicks minimized his actions on January 6 and initially told the FBI that he was let into the building. During his second interview, he walked back that statement and said that law enforcement let him into the barriers. *Fourth*, Hicks has shown no remorse and has not accepted responsibility for his actions. In his interview with the FBI, Hicks claimed he had every right to be there. He blamed others for violence and repeatedly sought to downplay his role by claiming that he was there "peacefully." Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B. Hicks' History and Characteristics

As set forth in the PSR, Hicks does not have any criminal history. Hicks reported to the PSR writer that he enlisted in the United States Air Force in July 1993 and was honorably discharged in February 1994. PSR ¶ 49. Hicks also expressed in an interview with the FBI that he came from a military background—his dad and all of his dad's brothers were military. Ex. 501 at 11:23. He most recently worked as a delivery driver and laborer. PSR ¶¶ 52-54.

While Hicks' military service is laudable, it renders his conduct on January 6 all the more troubling. His voluntary decision to storm a guarded government building is disturbing in light of

his former military service and training. He knew, based on his experience, that being a citizen or taxpayer does not give one the right to enter restricted government buildings – certainly, as an active service member he did not allow civilians onto restricted military base on the basis that they were citizens or taxpayers. He also violated his oath to the Constitution by rioting at the Capitol in an attempt to install the candidate who lost an election. In this case, Hicks' conduct and former military service demonstrates a very real need for specific deterrence in the form of incarceration.



.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.")

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of incarceration.

Hicks has taken absolutely no responsibility for his actions on January 6 and shows a clear need for specific deterrence through a jail time sentence. He told FBI agents who interviewed him after January 6 that he had a right to be in the Capitol building and consistently emphasized that he was peaceful despite participating in the siege. He also initially lied by stating that he was let into the building. Further, Hicks has not taken any steps to denounce his actions on January 6, 2021. As late as August 2023, when Hicks was interviewed by the FBI, he claimed that the election

13

had been stolen and that the violence on January 6 was perpetrated by the "deep state" – rather than the mob he joined. He also claimed that Trump supporters were being unfairly maligned for their conduct on January 6 and blamed it on Antifa and Black Lives Matter groups. As this Court has previously recognized, such a position is inconsistent with the facts and dangerous. *See United States v. Bonawitz*, 23-cr-55 (JMC), January 17, 2024 Tr. 37 ("[T]here's this view that people who were arrested on January 6th are like political prisoners being imprisoned for their political beliefs. I just think that's so dangerous. I want you to understand, I don't care anything about your political beliefs at all. You're entitled to have whatever beliefs you want. It's the actions that are landing people in court and that you're facing sentencing for.")

The Court should view any remorse Hicks expresses at sentencing with skepticism at best. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan).

With the 2024 presidential election approaching and many loud voices in the media and online continuing to sow discord and distrust, the potential for a repeat of January 6 looms ominously. The Court must sentence Hicks in a manner sufficient to deter him specifically, and others generally, from going down that road again.

### E. The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as

in this case, to assault on police officers.[2] This Court must sentence Hicks based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Hicks has been found guilty on Counts Four and Five of the Indictment, charging him with Disorderly Conduct in a Capitol Building and Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D) and 40 U.S.C. § 5104(e)(2)(G). These offenses are Class B misdemeanors. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. § 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), do apply, however.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, other cases provide some helpful comparisons. For instance, in *United States v. Russell Alford*, 1:21-cr-263 (TSC), the defendant was sentenced to 12 months of incarceration for his participation in the attack on January 6, 2021. Alford was convicted after a trial of 18 U.S.C. § 1752(a)(1), 18 U.S.C. § 1752(a)(2), 40 U.S.C. § 5104(e)(2)(D), and 40 U.S.C. § 5104(e)(2)(G). Like Hicks, it was clear to Alford that he should not have been at the Capitol building that day. Both observed tear gas and saw that property was destroyed. Unlike Alford, however, Hicks was willing to use physical force to enter the Capitol building. Even if Hicks was unaware that officers were on the other side of his push, that Hicks engaged in a push at all in order

---

[2] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

to get into the building distinguishes his conduct. Both defendants were not candid about their conduct. Alford was not truthful at trial about a number of topics during his testimony, including his observation of barricades and his knowledge of the broken doorway that he entered through. Similarly, as detailed above, Hicks was not forthcoming with the FBI about his entry into the Capitol building, showed no remorse for his actions and blamed others. Although Hicks did not post his thoughts about the certification to social media as Alford did (as far as the government is aware), both defendants also expressed dangerous views about the events of January 6.

In *United States v. Stacy Wade Hager*, 1:21-cr-381 (TSC), Hager was sentenced to 7 months of incarceration following his conviction after a bench trial of 18 U.S.C. § 1752(a)(1), 18 U.S.C. § 1752(a)(2), 40 U.S.C. § 5104(e)(2)(D), and 40 U.S.C. § 5104(e)(2)(G). On January 6, 2021, Hager illegally entered the United States Capitol building. Like Hicks, Hager saw obvious signs that he should not be there. Hager recorded videos of himself in the scaffolding amid flashbangs and tear gas. Unlike Hicks, Hager was extremely vocal, chanting, and yelling in the direction of officers. However, Hicks engaged in force while at the Capitol building by pushing against rioters in the doorway. Hager did not take any forceful actions. Hager and Hicks both expressed beliefs that January 6 was some sort of hoax and blamed others for the riot.

In *United States v. John Nassif*, 1:21-cr-421 (JDB), Nassif was sentenced to 7 months of incarceration for violations of 18 U.S.C. § 1752(a)(1), 18 U.S.C. § 1752(a)(2), 40 U.S.C. § 5104(e)(2)(D), and 40 U.S.C. § 5104(e)(2)(G). Both Nassif and Hicks entered through the Rotunda doors of the Capitol on January 6, 2021. Both defendants saw broken glass on the Rotunda doors and other signs that they should not have been there. While inside, Nassif attempted to enter the Rotunda where police were attempting to remove rioters and rioters were resisting officers' efforts. Nassif joined the crowd and pushed against officers. Similarly, Hicks pushed against rioters in an

attempt to enter the Rotunda doors and get back into the Capitol building. After the events of January 6, Nassif, like Hicks, attempted to minimize his conduct. Among other things, he wrote on social media that he was there to "peacefully protest" and that "people were peacefully in the doorway verbally expressing their displeasure." At trial Nassif made uncredible statements many of which were similar to those Hicks made to the FBI about being pushed into the Capitol, a belief that he could be there, and that he could not leave the Capitol because the crowd was pushing him in. Unlike Hicks, Nassif encouraged rioters while he was at the Capitol and made statements prior to January 6 about the potential for violence. However, Hicks' conduct is also distinguishable because he went into the Capitol building once and then attempted to go back in another time, unlike Nassif. Neither defendant expressed remorse prior to sentencing.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

### V.  Fine

The defendant's convictions for violations of 40 U.S.C. §5104(e)(2)(D) and 40 U.S.C. §5104(e)(2)(G) subject him to a statutory maximum fine of $5,000 for Count Four and $5,000 for Count Five. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1). Here, the defendant's financial assets set forth in the PSR suggest that the defendant is unable, and is unlikely to become able, to pay a fine.

### VI.  Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence the defendant to 6 months of incarceration on Count Four, 36 months of probation on Count Five, and 60 hours of community service. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on Hicks' liberty as a consequence of his behavior.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:  s/ *Kathryn E. Bolas*
Kathryn E. Bolas
Michael L. Barclay
Assistant United States Attorneys
Members of New York Bar
601 D Street, N.W.
Washington, D.C.
Phone: 202-252-0872
Kathryn.Bolas@usdoj.gov
Michael.Barclay@usdoj.gov