UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | No.  23-CR-399 (JMC) |
| v. ) | |
| ) | |
| JOSEPH HICKS ) | |

**DEFENDANT'S MEMORANDUM IN AID OF SENTENCING**

Believing at the time that the 2020 presidential election was wrought with fraud, Joseph Hicks decided to come to Washington, D.C. on January 6th, to attend the Trump rally.  He arrived at the Capitol intending to exercise his constitutional rights.

Mr. Hicks walked from the rally to the Capitol as Trump encouraged his supporters to do.  He entered the Capitol once and spent a total of 18 minutes inside.  He was interviewed by the FBI about 5 months later and then again over two years later, in August 2023.  Mr. Hicks had no plan, intention, or thought to take over the government on January 6th.  He was not part of a militia group seeking to overthrow the government.  He was charged more than 3 years after the events of January 6th.  Based on the nature and circumstances of the offense, his background, his superb performance on pretrial release, and the relevant sentencing factors pursuant to 18 U.S.C. § 3553(a), the defense respectfully requests a sentence of probation, which would be a sentence not greater than necessary to

1

address his conduct in this case.[1]

## TIMELINE OF JANUARY 6th EVENTS

The timeline of January 6th is well-known.  Approximately 30,000 people were expected to attend.[2]  Around 6 a.m. that day, numerous Trump supporters headed towards the rally at the Ellipse and "[m]any began gathering the night before."[3]  Mr. Hicks traveled to Washington, D.C. on January 5th.  He went to the Capitol on January 6th "because he wanted this voice to be heard and hoped that the election would be overturned," 6/27/24 Tr. of Verdict at 5:14-15, ECF No. 50, like hundreds of other individuals.  He entered at the Capitol through the East Rotunda Door at 2:41 p.m., approximately 2 hours after the initial breach of the restricted perimeter line at Peace Circle on the West Front of the Capitol.

Mr. Hicks "milled around the Capitol building.  He walked through the Rotunda and Statuary Hall.  He waved his flag around and fist bumped another rioter."  6/27/24 Tr. of Verdict at 7:12-14.  Mr. Hicks left the building approximately 18 minutes later.  *Id*. at 7:21-23.  About half an hour after he left, Mr. Hicks returned to the Rotunda door where smoke was present and other rioters were pushing their way back into the Rotunda door.  The scene was "loud and chaotic."

---

[1]  The Probation Office also recommends a period of probation (24 months) and restitution.
[2]  Though President Trump boasted that the rally numbered "hundreds of thousands of people", the rally's organizers projected just 30,000 participants.  *See* Andrew Beaujon, *Here's What We Know About the Pro-Trump Rallies That Have Permits*, The Washingtonian (Jan. 5, 2021), available at https://www.washingtonian.com/2021/01/05/heres-what-we-know-about-the-pro-trump-rallies-that-have-permits/.
[3]  George Petras, Janet Loehrke, Ramon Padilla, Javier Zarracina and Jennifer Borresen, *Timeline: How the storming of the U.S. Capitol unfolded on Jan. 6*, USA Today, Updated Feb. 9, 2021, available at https://www.usatoday.com/in-depth/news/2021/01/06/dc-protests-capitol-riot-trump-supporters-electoral-college-stolen-election/6568305002/ (last accessed on Feb. 28, 2022).

2

*Id*. at 8:6.  The government continues to push the false narrative that Mr. Hicks pushed against officers at the Rotunda door to try to regain entry, but as the Court found in its verdict, Mr. Hicks pushed another rioter and was then pulled into the doorway by an officer, before being let go, and walking away.  *Id*. at 9:4-5 ("Mr. Hicks certainly pushed against the man in the olive green jacket."); *id*. at 9:12-14 ("After the main in the olive green jacket left, Mr. Hicks turned his back to the now visible police line and faced way [sic] from the building."); *id*. at 9:16-19 ("An officer wearing black gloves then pulled Mr. Hicks by his jacket backwards for a few steps, and when the officer let go of him Mr. Hicks's sweatshirt rebounded and he walked out of the doorway to the outside of the building.").

Mr. Hicks engaged in no violence or destruction of property on January 6, 2021.  On June 14, 2021, and August 27, 2023, Mr. Hicks agreed to speak to law enforcement without an attorney about his conduct on January 6th.  He admitted his presence on January 6th.  He explained that he "attempted to enter the rally but was told he could not with his flag," *id*. at 6:15-16.  While Mr. Hicks referred to Trump's speech, it was clear he did not watch Trump's speech in real time.

## LEGAL PRINCIPLES

Disorderly and Disruptive Conduct in a Capitol Building or Grounds, in violation of 40 U.S.C. § 5104(e)(2)(D) (Count Four) and Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G) (Count Five), are class B misdemeanors or "petty offenses", as defined by 18 U.S.C. § 3559(a)(7), because they individually carry a maximum incarceration period of six

months or less. The United States Sentencing Guidelines (Guidelines) do not apply to class B misdemeanors. *See* U.S.S.G. §1B1.9. In addition, pursuant to 18 U.S.C. § 3583(b)(3), the Court is disallowed from imposing a term of supervised release for a petty offense.

Since the Guidelines do not apply, the Court is directed to look to 18 U.S.C. § 3553(a) to impose a sentence that is "sufficient, but not greater than necessary, to comply with the purposes [of sentencing]." The factors enumerated in 18 U.S.C. § 3553(a)(1) include "the nature and circumstances of the offense and the history and characteristics of the defendant." Additionally, the Court should determine the "need" for the sentence, by considering if and how a term of incarceration would "reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense." *Id*. at (2)(A). Moreover, the Court should consider how a sentence would "afford adequate deterrence to criminal conduct," "protect the public from further crimes of the defendant," and "provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." *Id*. at 2 (B-D). Further still, the Court must be mindful of "the kinds of sentences available," should consider "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct," and should consider the "need to provide restitution to any victims of the offense." *Id*. at (3), (6), & (7).

As the D.C. Circuit held, Congress did not intend for split sentence of probation and imprisonment for petty offenses. *United States v. Little*, *78* F.4th 453

(D.C. Cir. 2023). Even in cases where defendants are found guilty of two petty offenses as opposed to one, the restriction should still apply because the government in many cases seeks to circumvent *Little* with its charging decision. A sentence of probation and imprisonment would "subvert the Sentencing Reform Act's general rule that probation is a standalone sentence, combinable only with a fine, not with imprisonment." *Id.* at 458.

## ARGUMENT

Mr. Hicks is a hardworking 50-year-old military veteran and single father. He has worked various laborious jobs from grounds keeping to delivery driving. His focus day to day is his son, his mental health, and his faith. While the nature and circumstances of the January 6th events were indeed serious, his particular actions that day, paired with his individual history and characteristics do not lend itself to a sentence of incarceration. Rather, a sentence of probation would meet the purposes of sentencing, without being overly punitive. A probationary sentence would provide adequate deterrence to Mr. Hicks, avoid an unwarranted sentencing disparity among other January 6th defendants, and is warranted in light of his stellar performance on pretrial release.

### I. Nature and Circumstances of Mr. Hicks's Offense

Mr. Hicks acknowledges that he should not have entered the Capitol on January 6, 2021, and would never engage in similar behavior again. He recognizes that his presence contributed to the chaos on January 6th. However, he was not the cause of January 6th, nor was he in the category of people who caused physical harm

to others or damage to the Capitol buildings.  He entered the building, but his unlawful entrance cannot, and should not, be conflated with the many other, wider, failures that occurred that day.  Various factors led to the Capitol being breached, including "paralysis" "exacerbated by the patchwork nature of security across a city where responsibilities are split between local and federal authorities" and "driven by unique breakdowns inside each law enforcement agency."[4]  To characterize Mr. Hicks as the proximate cause of the January 6th event fails to acknowledge these other failures, and places an unjust blame on one non-violent, non-destructive individual.  The American system of justice, and specifically 18 U.S.C. § 3553(a), directs this Honorable Court to look at every defendant and every defendant's actions individually.  *See Kimbrough v. United States*, 552 U.S. 85, 90 (2007); *Gall v. United States*, 552 U.S. 38 (2007).

Mr. Hicks traveled to D.C. to peacefully protest the election and attend the Trump rally.  He did not intend to harm anyone at the Capitol or overthrow the government.  He was not able to enter the area designated for the rally because he had a sign, so he stood closer to the Washington Monument.  Like many people present on January 6th, he heard stories and news reports that Antifa and other organizations sent supporters to the Capitol who engaged in violence.  Mr. Hicks himself did not engage in any violence or destruction on January 6, 2021.  The fact

---

[4]  *See* Jacqueline Alemany, et. al., *Before, During, and After Bloodshed*, The Washington Post (Oct. 31, 2021), available at https://www.washingtonpost.com/politics/interactive/2021/what-happened-trump-jan-6-insurrection/?itid=hp-top-table-main.

6

that he repeated conspiracy theories he heard about that day to the FBI during his interviews does not exacerbate his conduct on January 6th. The government also continues to stress the meaning of the flag that Mr. Hicks carried on January 6th as further evidence that Mr. Hicks had violent or destructive or antigovernment motives. There is no evidence that Mr. Hicks was a member of the 3%ers or that he carried the flag with the intent to portray any specific anti-government message.

Mr. Hicks entered the Capitol and wandered around the Rotunda and Statuary Hall for approximately 18 minutes. He did not destroy anything. He did not assault anyone. He did not directly or intentionally engage with police officers at all. When Mr. Hicks entered the Capitol at the East Rotunda Door, it was already open. He did not push the door open. He simply walked in.

As discussed above and, as the Court is well aware from the bench trial, approximately 30 minutes after exiting the Capitol, Mr. Hicks returned to the outside of the Rotunda door. There, he pushed on another rioter, stumbled around due to the smoke, chaos, and confusion in that area, and was pulled backwards by an officer before the officer released his hooded sweatshirt and Mr. Hicks walked away. The government's attempt to continue to re-imagine the facts, even after the Court's verdict is astounding. Mr. Hicks did not push backward against any officers and left as soon as he was released by the officer that pulled him back.

The government focuses a lot of attention on Mr. Hicks's interviews with the FBI arguing that he lied and showed no remorse because he claimed he had a right to be there and was there "peacefully." First, Mr. Hicks's inconsistent statements

7

are not lies, but a result of the fallibility of memory and imprecise language.  Mr. Hicks is not a lawyer, who carefully considers and chooses his words.  In his initial interview, he said he was let in.  In his second interview, he clarified that he meant let in past the barriers.  The government wants the Court to assume the most sinister motive is the actual motive behind Mr. Hicks's statements, when the most reasonable understanding is that Mr. Hicks was not clear in his first interview and tried to clarify the misunderstanding the second time.  Additionally, Mr. Hicks's statement that he was "peaceful" is not false.  He walked calmly around the Capitol when he was inside.  He did not assault an officer.  He did not push an officer.  In one brief moment, he pushed another protestor.  That does not make his statement that he was peaceful incorrect or a minimization of his actions.  Mr. Hicks's actions were all on video, which the Court viewed during the trial and during the Court's deliberation.  Mr. Hicks was peacefully protesting.

Finally, Mr. Hicks went to trial to specifically challenge the felony charge in this case.  He never denied entering the building.  He did not deny being back at the door 30 minutes after exiting.  The focus of the trial was targeted on a difference in understanding of his actions for approximately 2 minutes.  Actions that the Court found did not support a guilty verdict on the felony count.

Mr. Hicks gave two unrepresented interviews to the government.  He admitted to being at the Capitol and entering the building.  He told them he saw people breaking things and being violent.  Mr. Hicks was not violent.  He was not

destructive. A sentence of probation is sufficient, but not greater than necessary to satisfy the purposes of punishment.

## II. Mr. Hicks's History and Characteristics

As state above, Mr. Hicks is a 50-year-old single father and military veteran, whose daily goals are to work hard to provide for his son, maintain his mental health, and practice his faith. He is guided by his faith to manage the daily stress that comes with a physically challenging job with sometimes sporadic income. He grew up most of his life in Missouri. His parents divorced when he was five years old, and he was predominately raised by his mother. Both of his parents are now deceased, his mother having recently passed from Alzheimer's in 2023.

Mr. Hicks has four half-siblings and he has occasional contact with most of them who all live in Missouri. He has never been married, but he has a 19-year-old son. Although he never married his son's mother, they raised Skylar together and continue to live together.

After graduating high school, Mr. Hicks followed in his father's footsteps and joined the miliary. While his father was a Marine, Mr. Hicks enlisted in the United States Air Force when he was 19 years old. He was an enlisted member of the Air Force for approximately 8 months in 1993 and 1994, when he was honorably discharged for ▮▮▮▮▮▮. While in the military, he attended basic training and technical school and served in Korea until his medical discharge. With his service, Mr. Hicks stands shoulder to shoulder with his father and all his uncles who served this country.

9

He is currently employed as a laborer at Lawn Care Plus in Springfield, Missouri and has been employed for the entirety of his pretrial release on this case. His employer submitted a letter to the Court stating, "Joseph Hicks has shown loyalty to his work, by being on time, clean and polite to those around him, as well as the customers that we work for." Ex. A, Letter of Orvile Harris ("Joe has a good reputation with his integrity and the maturity he has shown.").

Since the events of January 2023, Mr. Hicks 

Mr. Hicks's character is demonstrated most clearly through the letters from his friends and family. They describe him as "a law abiding, peaceful, God fearing man who truly loves our Country," Ex. C, Letter of Sean Trudell, and "a good Christian, and a peaceful, law-abiding, and patriotic person," Ex. D, Letter of

Christine Griend. Mr. Frank Gillham states that Mr. Hicks is "simple and soft spoken but abounds in empathy and compassion," noting instances where he "patiently listen[ed]" to "complete strangers as they've shared a worrisome or sad story" and "gently encouraged them with words of kindness." Ex. E, Letter of Frank B. Gillham. Mr. Hicks is a religious man, who loves his country and his fellow man. His family and friends also repeatedly share Mr. Hicks's support and respect for law enforcement. *See* Ex. C ("He has always been a strong supporter of police officers and law and order."), Ex. E ("I have always known Joe to be respectful of law enforcement.").

It is clear from Mr. Hicks's history and characteristics, especially his work with his mental health treatment provider, that a sentence of incarceration is not necessary to satisfy the purposes of punishment in this case.

### III. A Probationary Sentence Would Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense.

18 U.S.C. § 3553(a)(2)(A) provides that the Court must assess "the need for the sentence imposed— . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." Incarceration is not required in order for a sentence to reflect the seriousness of the offense. "A sentence of probation rather than incarceration can work to promote the sentencing goal of respect for the law by illustrating a rejection of the view that the law is merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing." *United States v. Bennett*, No.

11

8:07CR235, 2008 U.S. Dist. LEXIS 45302, at *12 (D. Neb. May 30, 2008) (citing *Gall*, 552 U.S. at 99).

### IV. A Probationary Sentence Would Provide Adequate Deterrence to Criminal Conduct and Protect the Public from the Unlikely Chance of Further Crimes of Mr. Hicks.

Under 18 U.S.C. § 3553(a)(2)(B) and (a)(2)(C), this Court must also consider "the need for the sentence imposed—. . . to afford adequate deterrence to criminal conduct...[and] to protect the public from further crimes of the defendant." The public has been protected while Mr. Hicks has been on pretrial release. For the last year, Mr. Hicks has complied with supervision requirements. The public will be protected while Mr. Hicks is being supervised by the Probation Officer, which will further deter any criminal conduct.

While "[p]rison is an important option for incapacitating and punishing those who commit crimes," evidence suggests that lengthy prison sentences do not have a "chastening" effect and "produce at best a very modest deterrent effect." *Five Things About Deterrence*, Nat'l Inst. Justice, U.S. Dep't of Justice, 1-2 (May 2016). With respect to specific deterrence, research shows conclusively that "[t]he *certainty* of being caught is a vastly more powerful deterrent than the punishment," that "[s]ending an individual convicted of a crime to prison isn't a very effective way to deter crime," and that "[i]ncreasing the severity of punishment does little to deter crime." *Id.* (emphasis in original); *see also* James Austin *et al.*, *How Many Americans Are Unnecessarily Incarcerated?*, Brennan Ctr. For Just., N.Y. Univ. School of Law, 22 (2016) (quoting a 2011 study by criminologists concluding that

12

"across all offenders, prisons do not have a specific deterrent effect. Custodial sentences [jail and prison] do not reduce recidivism more than noncustodial sanctions."). No incarceration is needed to deter criminal conduct in this case.

### V. Sentence of Probation Would Not Create An Unwarranted Sentencing Disparity

Sentencing Mr. Hicks to probation would not contribute to an unwarranted sentencing disparity. Over 500 defendants have been sentenced in these cases.[5] A significant majority of the cases have been resolved as misdemeanor offenses. Defendants in other cases whose conduct was similar to Mr. Hicks's received probationary sentences. This Court has sentenced the following defendants to probation for walking into the Capitol building:

| Case | Plea & Sentence | Conduct |
|---|---|---|
| *U.S. v. Karthik Ramakrishn* 23-CR-247 | 40 U.S.C. § 5104(e)(2)(G) 6 months' probation | • Defendant spent **27 minutes** inside the Capitol and was banging a drum. ECF No. 20 at 4. |
| *U.S. v. Kim Connolly* 23-CR-31 | 40 U.S.C. § 5104(e)(2)(G) 6 months' probation | • Defendant spent **9 minutes** inside the Capitol. ECF No. 19 at 3. |
| *U.S. v. Christopher Ortiz* 22-CR-82 | 40 U.S.C. § 5104(e)(2)(G) 12 months' probation 60 days' home detention | • Defendant entered the Capitol three times and was inside a total of approximately **13 minutes**. ECF No. 31 at 3-4. |
| *U.S. v. James Brooks* 22-CR-18 | 18 U.S.C. § 1752(a)(1) 12 months' probation | • Defendant shouted at police officers and spent **10 minutes** inside the Capitol. ECF No. 27 at 3-4. |
| *U.S. v. Eric Gerwatowski* | 18 U.S.C. § 231(a)(3) 24 months' probation | • Defendant physically pulled open a door closed |

---

[5]   This estimate is based on the government's chart, filed in other cases.

13

| | | |
|---|---|---|
| 22-CR-125 | 30 days' home detention | by Capitol Police officers, directed other rioters inside the Capitol, and spent a few minutes inside the Capitol. ECF No. 25 at 4. |
| *U.S. v. Brennan Machacek* 23-CR-121 | 40 U.S.C. § 5104(e)(2)(G) 12 months' probation | • Defendant spent **39 minutes** inside the Capitol. ECF No. 21 at 4, 7. |
| *U.S. v. Conlin Weyer* 22-CR-169 | 18 U.S.C. § 1752(a)(1) 18 months' probation | • Defendant climbed through scaffolding, spent **35 minutes** inside the Capitol, and took a picture on top of a SWAT car. ECF No. 22 at 3-4. |
| *U.S. v. William Keen* 23-CR-60 | 40 U.S.C. § 5104(e)(2)(G) 18 months' probation | • Defendant encouraged others to enter the Capitol, spent **40 minutes** inside the Capitol, and smoked a cigarette inside the Capitol. ECF No. 22 at 5-6. |
| *U.S. v. David Smither* 24-CR-15 | 40 U.S.C. § 5104(e)(2)(D) 40 U.S.C. § 5104(e)(2)(G) 12 months' probation | • Defendant climbed through a broken window and spent **13 minutes** in the Capitol. ECF No. 15 at 3. |
| *U.S. v. Robert Colello* 24-CR-59 | 40 U.S.C. § 5104(e)(2)(D) 40 U.S.C. § 5104(e)(2)(G) 12 months' probation | • Defendant climbed an exterior wall at the Capitol and spent **1 minute** in the Capitol. ECF No. 9 at 1-2. |
| *U.S. v. Ulises Wilkinson* 23-CR_383 | 40 U.S.C. § 5104(e)(2)(D) 40 U.S.C. § 5104(e)(2)(G) 12 months' probation | • Defendant spent **42 minutes** in the Capitol and entered the Senate gallery. ECF No. 25 at 4-5. |
| *U.S. v. Giorgi Mamulashvili* 24-CR-165 | 40 U.S.C. § 5104(e)(2)(D) 40 U.S.C. § 5104(e)(2)(G) 12 months' probation | • Defendant spent **48 minutes** inside the Capitol. ECF No. 18 at 3-4. |

Even in cases where the defendant not only walked in and out of the Capitol, but also encouraged others to enter the Capitol, deleted social media posts, and/or yelled at officers, (facts not present in this case), defendants have received sentences of probation.

| | | |
|---|---|---|
| *U.S. v. Esther Schwemmer* 21-CR-364 (DLF) | 40 U.S.C. § 5104(e)(2)(G) 24 months' probation | • Defendant hurled insults at law enforcement officers and spent **15 minutes** inside the Capitol. ECF No. 29 at 4, 7 |
| *U.S. v. Edward McAlanis* 21-CR-516 (DLF) | 40 U.S.C. § 5104(e)(2)(G) 24 months' probation | • Defendant spent **15 minutes** inside. ECF No. 19 at 7 |
| *U.S. v. Lilith Saer* 22-CR-374 (DLF) | 40 U.S.C. § 5104(e)(2)(D) 40 U.S.C. § 5104(e)(2)(G) 36 months' probation | • Defendant entered the Capitol building through the Senate Wing Doors, within 10 minutes of the violent breach and spent **6 minutes** inside the Capitol building. ECF No. 30 at 8 |
| *U.S. v. Patricia Todisco* 22-CR-205 (DLF) | 40 U.S.C. § 5104(e)(2)(G) 24 months' probation | • Defendant entered the Capitol through the Senate Wing Doors and spent **28 minutes inside**. ECF No. 53 at 10. |
| *U.S. v. Michael Carico* 21-CR-696 (TJK) | 40 U.S.C. § 5104(e)(2)(G) 60 days home detention & 24 months' probation | • Defendant spent **52 minutes** in the Capitol, entered a few minutes after protestors broke inside; and deleted photos and videos he took on Jan. 6th . ECF No. 33 at 1-2 |
| *U.S. v. Gabriel Burress* 21-CR-744 (TJK) | 40 U.S.C. § 5104(e)(2)(G) 45 days home detention & 18 months' probation | • Defendant moved the metal barrier, waved others towards the Capitol, and spent **14 minutes** inside. ECF No. 46 at 8-16 |

| *U.S. v. Jordan Stotts* 21-CR-00272 (TJK) | 40 U.S.C. § 5104(e)(2)(G) 24 months' probation | • Defendant shouted at police officers, scaled the wall on the Upper West Terrace, posted on social media, and spent **nearly 1 hour inside**.  ECF No. 24 at 1-6 |
|---|---|---|
| *U.S. v. Robert Snow* 22-CR-00030 (TJK) | 40 U.S.C. § 5104(e)(2)(G) 12 months' probation | • Defendant entered the Capitol two minutes after the breach, waved people inside, spent **43 minutes inside**, and made his way to the 3rd floor of the building where many staff offices were located.  ECF No. 26 at 1-2 |

In cases where defendants received 14 days incarceration (a fraction of the government's request in this case), the defendant's conduct was far worse than Mr. Hicks's.  In *United States v. Paul Lovely*, No. 23-CR-19 (CKK), the defendant was associated with a right-wing group and decided to travel to the Capitol with four other individuals.  The group entered the Senate Wing doors three minutes after the doors were breached.  They proceeded through the Crypt and down to the hall of the Office of the Clerk and Office of the Majority Leader and entered Nancy Pelosi's conference room.  The defendant also stood by as one of the members of his group attempted to assault an officer by "ramm[ing] a bicycle rack into an officer."  ECF No. 53 at 1-12.  The defendant pled guilty to 40 U.S.C. §§ 5104 (e)(2)(D) and (e)(2)(G) and was sentenced to 14 days of intermittent confinement and 36 months of probation.

In *United States v. Victor Martinez*, No. 23-CR-39 (TSC), the defendant led a small group of protestors and pushed his way into the Capitol, celebrated entering

16

the building, recorded violent scuffles between police and protestors, and spent 50 minutes inside the Capitol. During a later FBI interview, the defendant minimized his conduct on January 6th. ECF No. 21 at 1-21. The defendant pled guilty to 40 U.S.C. § 5104 (e)(2)(G) and was sentenced to 14 days of intermittent confinement and 36 months of probation.

In *United States v. Dusty Higgins*, No. 23-CR-59 (RDM), the defendant recorded a video of himself entering the building through a broken window and posted messages on Instagram. The defendant expressed to another individual that he wanted to open a Proud Boys chapter, and his posts on social medial included Three Percenter logo and images. The defendant pled guilty to 40 U.S.C. § 5104 (e)(2)(G) and was sentenced to 14 days of intermittent confinement and 36 months of probation.

In other cases, where defendants pled to the more serious misdemeanor (18 U.S.C. § 1752), they received probation. *See United States v. Rachel Pert*, No. 21-CR-139 (TNM) (sentenced to 24 months' probation); *United States v. Jeffrey Witcher*, No. 21-CR-235 (RC) (12 months' probation); *United States v. Nicholes Lentz*, No. 21-CR-53 (CJN) (1 month home detention and 36 months' probation).

The § 1752 defendants who received intermittent confinement as a part of probation had more egregious than Mr. Hicks. In *United States v. Blake Reed*, No. 21-CR-204 (BAH). Reed discussed joining the Proud Boys. ECF No. 171 at 2. He posted a video of the crowd marching toward the Capitol which included the threat "we are coming for you." *Id.* He wore protective gear "to ward of[f] officers'

17

attempts to protect the Capitol." *Id.* at 3. Mr. Hicks did not. Reed took steps to conceal electronic evidence on his phone. Mr. Hicks did not. Reed appears to have mocked law enforcement after the execution of the search warrant. *Id.* at 25. Mr. Hicks did not. Reed received 42 days of intermittent confinement as part of his probationary sentence. Mr. Hicks's conduct was far below Reed's conduct. Hence, she should not receive a sentence of incarceration.

In *United States v. Schornak*, No. 21-CR-278 (BAH), the defendant received a sentence of 28 days of intermittent confinement and a term of probation. In that case, Schornak "traveled to the Visitor's Center and stole an American flag." *Schornak*, No. 21-cr-278, Gov't Sent. Memo, ECF 62 at 11. Mr. Hicks did not steal anything. Schornak boasted about stealing the flag and causing tyranny inside the Capitol and he was "damn proud of it." *Id.* at 16. Mr. Hicks did not.

Mr. Hicks's conduct was less egregious than other cases where defendants received probation. For example, in *United States v. Jackson Kostolsky*, No. 21-CR-197 (DLF), a 40 U.S.C. § 5104(e)(2)(G) case, the defendant "scaled the wall to get to the Upper West Terrace," was tear-gassed, and entered the Capitol through the Parliamentarian doors soon after it was breached. He also deleted videos from his phone. These facts are not present in Mr. Hicks's case.

The government's comparable cases are not comparable, instead involving defendants convicted of both the § 1752 and § 5104 misdemeanors.

Of the factors that the government deems to be critical in these cases, most of them are mitigating factors in Mr. Hicks's case. First, when he entered the Capitol,

he did not break any windows to gain entry. Second, Mr. Hicks did not encourage violence. Third, he did not encourage property destruction. Fourth, there is no evidence of significant reaction to violence or destruction. Fifth, during or after the riot, he did not destroy evidence. Sixth, Mr. Hicks was inside the building for a relatively brief amount of time, and he did not enter the Senate or House chambers where members of Congress were gathering to certify the election. Seventh, he did not make any notable posts on social media.

## Conclusion

Considering the § 3553(a) sentencing factors, a probationary sentence is a sufficient, but not greater than necessary, sentence to satisfy the purposes of sentencing.

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

_____/s/_____
Ubong E. Akpan
Diane Shrewsbury
Assistant Federal Public Defenders
625 Indiana Ave., N.W., Suite 550
Washington, D.C. 20004
(202) 208-7500